UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
DARRYL HARLEY,

                Plaintiff,

         - against -

CITY OF NEW YORK and POLICE OFFICER
CHRISTOPHER KELLY,

                Defendants.
----------------------------------------------------------x

**MEMORANDUM & ORDER**

14-CV-05452 (PKC) (VMS)

PAMELA K. CHEN, United States District Judge:

       Plaintiff Darryl Harley ("Plaintiff" or "Harley"), brings this action pursuant to 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments, and New York state law, alleging that he was falsely arrested on July 15, 2013. Plaintiff was accused of stealing a purse containing credit and debit cards, and of using the credit card without authorization. Presently before the Court is the City of New York's and Detective Christopher Kelly's ("Defendants") motion for summary judgment. For the reasons stated below, the Court grants Defendants' motion and dismisses this action in its entirety.

## BACKGROUND

**I.    Relevant Facts[1]**

       At the time of the incident at issue, Dr. Babita Sharma ("Dr. Sharma") lived in an apartment in the Lefrak City complex in Queens, where Plaintiff worked as a porter. (Pl. 56.1 ¶¶ 1–2.) On May 29, 2013, Plaintiff and a co-worker were inside Dr. Sharma's apartment repairing a toilet.

---

[1] The material facts discussed herein are undisputed and are taken from Plaintiff's Rule 56.1 Counter-Statement ("Pl. 56.1"). (Dkt. No. 37-2; Reply Br., Dkt. No. 42 at ECF 2 n.1.)

(Pl. 56.1 ¶ 5.) Plaintiff's co-worker left the apartment for about ten minutes, leaving Plaintiff alone with Dr. Sharma in the apartment. (Pl. 56.1 ¶ 6.) On May 31, 2013, Dr. Sharma received an email from her bank, the University Federal Credit Union, about suspicious activity on her account; Dr. Sharma was asked to verify that she had made certain purchases at Duane Reade and Macy's Department Store on May 30, 2013. (Pl. 56.1 ¶ 7.) Dr. Sharma replied to the email on May 31, 2013, informing her bank that she had not authorized the purchases from Duane Reade and Macy's. (Pl. 56.1 ¶ 8.) Dr. Sharma also stated in that email that her purse, containing money and her credit and debit cards, had been missing since the evening of May 29, 2013, when two people had entered her home to do maintenance work. (Pl. 56.1 ¶ 9.) In another email to her bank on May 31, 2013, Dr. Sharma asked the bank to keep her debit and credit cards blocked. (Pl. 56.1 ¶ 10.)

Dr. Sharma promptly reported the disappearance of her bank cards to Lefrak City security personnel. (Pl. 56.1 ¶ 11.) She told them that her black purse went missing when the two male maintenance workers worked in her apartment. (Pl. 56.1 ¶ 12.) Dr. Sharma reported the incident to Officer Stephen Ruotolo of the 110th Precinct on May 31, 2013. (Pl. 56.1 ¶ 13.) Dr. Sharma told Officer Ruotolo that: (1) she had been notified by her bank that $700 had been charged to her account at various locations; (2) following the notification from her bank, she realized that her wallet was missing; and (3) on May 29, 2013, maintenance workers had been working in her apartment, and that day was the last time she remembered seeing her wallet. (Pl. 56.1 ¶ 14.)

On June 2, 2013, Detective Kelly conducted an in-person interview with Dr. Sharma in which she, in large part, repeated the same facts that she had told Officer Ruotolo. (Pl. 56.1 ¶ 15.) Dr. Sharma also told Detective Kelly that she had been informed of the suspicious activity by her bank's Credit Fraud Department and that it was only upon receiving that communication that she noticed that her credit and debit cards were missing. (Pl. 56.1 ¶ 15.) She also told Detective Kelly

that she had not seen any maintenance worker steal her bank cards and that except for her and her husband, the Lefrak City maintenance workers were the only people to visit her apartment between the time she last saw her bank cards and when she realized that they were missing. (Pl. 56.1 ¶ 15.)

On June 2, 2013, Detective Kelly and Dr. Sharma participated in a three-way call with Dr. Sharma's bank. (Pl. 56.1 ¶ 16.) During the call, a bank representative confirmed that the unauthorized transactions had been made on Dr. Sharma's account on May 30, 2013, at Macy's, Duane Reade, and Popeye's; the bank's representative also stated that the bank had cancelled Dr. Sharma's bank cards as of May 31, 2013. (Pl. 56.1 ¶¶ 16–17.) On June 8, 2013, Detective Kelly viewed video surveillance footage from the Duane Reade where Dr. Sharma's card was used, but the tape did not show who made the unauthorized purchases because the camera was focused on the cash register, not on the customer. (Pl. 56.1 ¶ 19.) Detective Kelly also viewed video surveillance footage from the Popeye's where Dr. Sharma's card was used, but he concluded that the footage was of no investigative use due to the high volume of customers present at the time when the card was used. (Pl. 56.1 ¶ 20.)

On June 21, 2013, Detective Kelly viewed the Macy's video surveillance footage ("Macy's Video") of the unauthorized transaction. (Pl. 56.1 ¶ 24.) Detective Kelly also received, from an Assistant Loss Prevention Manager at Macy's, a photograph of a male and female tendering Dr. Sharma's card. (Pl. 56.1 ¶ 24.) After receiving a copy of the Macy's Video, Detective Kelly showed Dr. Sharma the photograph and the Macy's Video on June 26, 2013. (Pl. 56.1 ¶¶ 25–26.) After that first viewing, Dr. Sharma was unable to state whether the male in the Macy's Video was one of the maintenance workers who had been inside her apartment when her card was last seen. (Pl. 56.1 ¶ 27.) On June 27, 2013, Detective Kelly marked the case closed because, among other

3

reasons, Dr. Sharma had not identified anyone from the Macy's Video, there was no other relevant video footage, and Dr. Sharma was not liable for the authorized purchases. (Pl. 56.1 ¶ 28.)

At some point after Detective Kelly closed the case, but before July 8, 2013, Dr. Sharma wrote to Detective Kelly and informed him that the man on the tape was named "Harley" because that name was written on one of the two maintenance worker's uniforms. (Pl. 56.1 ¶ 29.) She also told Detective Kelly that she "asked him his name once and he said I know why you are asking." (Pl. 56.1 ¶ 29.) On July 8, 2013, at Dr. Sharma's request, Detective Kelly met with her a second time so that she could again review the Macy's Video. (Pl. 56.1 ¶¶ 31–32.) After viewing the Macy's Video a second time, Dr. Sharma informed Detective Kelly that the man on the tape was Darryl Harley. (Pl. 56.1 ¶ 32.) Detective Kelly believed that Dr. Sharma was telling the truth when she made that statement; it was his impression that Dr. Sharma had seen Harley between the first and second time that she viewed the Macy's Video. (Pl. 56.1 ¶¶ 33–34.)

Detective Kelly called a supervisor at Lefrak City who confirmed that Harley was employed there as a maintenance worker. (Pl. 56.1 ¶ 35.) On July 15, 2013, Detective Kelly and another detective went to speak to Plaintiff at Lefrak City. (Pl. 56.1 ¶ 36.) Upon being asked if Plaintiff knew why the officers were there, Plaintiff replied that "he had a feeling." (Pl. 56.1 ¶ 37.) Before Plaintiff was arrested, one of the detectives told Plaintiff that there was a video of Plaintiff using a credit card in Macy's. (Pl. 56.1 ¶ 41.) Plaintiff later asked the detective if the detective had seen the video, and the detective replied he had. (Pl. 56.1 ¶ 42.) Plaintiff also asked, "Was that me [in the video]?" and "Did it look like me?", to which the detective responded, "It looked just like you.

4

It was you." (Pl. 56.1 ¶ 43.)[2]  In fact, upon seeing Plaintiff in person, Detective Kelly believed that Plaintiff looked like the man in the Macy's Video. (Pl. 56.1 ¶ 45.)

Plaintiff saw Dr. Sharma three times after the disappearance of her bank cards. (Pl. 56.1 ¶ 50.) The first time Dr. Sharma saw Plaintiff after the bank cards went missing, she asked Plaintiff if he knew who had taken her wallet, and asked him to tell the person who had taken the wallet to give her back her bank cards. (Pl. 56.1 ¶ 51.) The second time, Dr. Sharma, referring to Plaintiff, said to the people who she was walking with, words to the effect of, "That's the one, he's the one that did it." (Pl. 56.1 ¶ 52.)[3]

In May 2013, Plaintiff's work schedule was Sunday to Thursday, 3 p.m. to midnight, with a one-hour break, during which time he was free to leave the Lefrak City complex. (Pl. 56.1 ¶¶ 55, 64.) Plaintiff was classified as a night porter and he usually worked alone when he cleaned, made repairs, and performed other maintenance work. (Pl. 56.1 ¶¶ 56, 58.) During his shifts, Plaintiff travelled unmonitored between the four buildings in the complex for which he was responsible. (Pl. 56.1 ¶¶ 59–60.) Plaintiff did not have to sign in and out of buildings, swipe electronically, or notify anyone when he was entering or leaving a building. (Pl. 56.1 ¶¶ 59–60.) Plaintiff did not have to report to anyone before he started or after he completed repair jobs, nor did anyone tell him what apartment or floor he had to work on at a specific time. (Pl. 56.1 ¶¶ 61, 63.) If security needed to contact Plaintiff, security could call his work pager or personal cell phone. (Pl. 56.1 ¶ 62.)

---

[2] Plaintiff testified at his deposition in this case that he had no reason to believe that the detective was not being truthful when he stated that Plaintiff looked like the man on the tape. (Pl. 56.1 ¶ 46; Deposition of the Plaintiff ("Pl. Dep."), Dkt. No. 39-3 at 210:22–25.)

[3] The second encounter occurred before Plaintiff's arrest. (Pl. 56.1 ¶ 53.) Although the parties mention three encounters between the Plaintiff and Dr. Sharma, they do not substantively discuss the third encounter. (*See* Pl. 56.1 ¶¶ 50–53.)

The Macy's at which Dr. Sharma's card was used is located at 136-50 Roosevelt Ave,[4] approximately 3.2 miles from Lefrak City. (Pl. 56.1 ¶¶ 68–69.) Plaintiff generally drove to work. (Pl. 56.1 ¶ 70.)

Plaintiff was accused of using Dr. Sharma's credit card at Macy's and was arrested on July 15, 2013. (Pl. 56.1 ¶¶ 41, 45; Dkt. No. 39-4 at ECF[5] 28.) Plaintiff was kept in police custody for nine hours after which his arrest was voided by the Queens County District Attorney's Office. (Pl. 56.1 ¶ 71; Answer, Dkt. No. 27 ¶ 27.)

## II. Procedural History

Plaintiff commenced this action on September 17, 2014. (Dkt. No. 1.) Defendants' motion to dismiss was fully briefed on May 11, 2015. (Dkt. Nos. 10–15.) On February 10, 2016, the Court granted Defendants' motion to dismiss in part and denied it in part, dismissing all claims except Plaintiff's false arrest claim, pursuant to § 1983 and New York law, as to Detective Kelly, and pursuant to New York law, as to the City of New York.[6] (Dkt. No. 22 at ECF 15.) Defendants' motion for summary judgment on the remaining claims was fully briefed on December 14, 2016. (Dkt. Nos. 36–42.)

---

[4] In his 56.1 Statement, Plaintiff disputed the address of the Macy's where Dr. Sharma's credit card had been used. (Pl. 56.1 ¶ 68.) Defendants, in their reply brief, indicated that Plaintiff was correct about the address of the Macy's where Dr. Sharma's credit card was used, thereby removing any dispute regarding this fact. (Reply. Br., Dkt. No. 42 at ECF 2.)

[5] Citations to "ECF" refer to the pagination generated by the Court's electronic docketing system and not the document's internal pagination.

[6] Plaintiff's remaining claim against the City is based on a theory of *respondeat superior* liability and requires that Detective Kelly be found to have violated New York law by falsely arresting Plaintiff. (Order, Dkt. No. 22 at ECF 11–12.)

**DISCUSSION**

**I.     Summary Judgment Standard**

"Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law." *Summa v. Hofstra Univ.*, 708 F.3d 115, 123 (2d Cir. 2013) (quoting *Weinstein v. Albright*, 261 F.3d 127, 132 (2d Cir. 2001)); *see also* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "Material" facts are facts that "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The moving party bears the burden of establishing the absence of any genuine issue of material fact." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010) (citing *Celotex Corp.*, 477 U.S. at 322). Once a defendant has met his initial burden, the plaintiff must "designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324 (internal quotation marks omitted). In determining whether there are genuine disputes of material fact, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (citation and internal quotation marks omitted).

The Court's inquiry upon summary judgment is "determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. "Summary judgment is appropriate only '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012) (alterations in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## II. Plaintiff's False Arrest Claim[7]

Plaintiff claims he was falsely arrested in violation of § 1983 and New York state law. "A section 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law." *Jenkins v. City of N.Y.*, 478 F.3d 76, 84 (2d Cir. 2007) (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). A "claim for false arrest derives from [a plaintiff's] Fourth Amendment right to remain free from unreasonable seizures, which includes the right to remain free from arrest absent probable cause." *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006) (citing *Weyant*, 101 F.3d at 852). To prevail on a false arrest claim, a plaintiff must demonstrate that: (1) the defendants intended to confine him; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged. *Faltine v. Murphy*, No. 15-CV-3961, 2016 WL 3162058, at *4 (E.D.N.Y. June 3, 2016) (citations omitted). When reviewing § 1983 claims for false arrest, courts will look to the law of the state where the arrest occurred. *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004) (citations omitted). "The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest,' whether that action is brought under state law or under § 1983." *Jenkins*, 478 F.3d at 84 (quoting *Weyant*, 101 F.3d at 852). "The Court may determine, as a matter of law, whether

---

[7] The Court dismissed Plaintiff's municipal liability claims against the City of New York, without prejudice, on the grounds that Plaintiff had "abandoned" them, and because Plaintiff had failed to plead a municipal policy or custom, or that any policy or custom was the moving force behind Plaintiff's arrest. (Memorandum & Order, Dkt. No. 22 at ECF 12–15.) Plaintiff again asserted municipal liability claims in the Amended Complaint, but failed to allege any additional facts to bolster these claims. (*Compare* Complaint, Dkt. No. 1, Counts Two and Three *with* Amended Complaint, Dkt. No. 23, Counts Two and Three.) Thus, the Court does not address these claims, as they are substantively identical to the claims that were already dismissed. Moreover, Plaintiff did not address these claims in the instant motion, so to the extent Plaintiff did attempt to re-plead his municipal liability claims, the Court considers them abandoned. *See Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014) ("[A] court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.")

8

probable cause existed where there is no dispute as to the pertinent events or the knowledge of the arresting officers." *Cruz v. City of N.Y.*, 232 F. Supp. 3d 438, 454 (S.D.N.Y. 2017) (citing *Weyant*, 101 F.3d at 852).

"Probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant*, 101 F.3d at 852 (citations omitted). "Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997); *Baker v. McCollan*, 443 U.S. 137, 145–46 (1979) (arresting officers not required to investigate claim of mistaken identity or lack of requisite intent). When reviewing an officer's probable cause determination, courts "consider the facts available to the officer at the time of the arrest." *Ricciuti*, 124 F.3d at 128 (citing *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569 (2d Cir. 1996)). "Whether probable cause existed is a commonsense inquiry, based on the totality of the circumstances, not on reflexive, isolated, or technical criteria." *Cruz*, 232 F. Supp. 3d at 453 (citing *Illinois v. Gates*, 462 U.S. 213, 232 (1983), *United States v. Falso*, 544 F.3d 110, 117 (2d Cir. 2008), and *United States v. Delossantos*, 536 F.3d 155, 159 (2d Cir. 2008)).

The Court finds that Detective Kelly had probable cause to arrest Plaintiff. There is no dispute as to the pertinent events or Detective Kelly's knowledge at the time of the arrest. At the time of Plaintiff's arrest, Detective Kelly was aware of the following undisputed facts: (1) Plaintiff had worked in Dr. Sharma's apartment on May 29, 2013, and during that time, was alone in the apartment with Dr. Sharma for about ten minutes; (2) Dr. Sharma's purse, containing money and debit and credit cards, had been missing since the evening of May 29, 2013; (3) other than the

maintenance workers, only Dr. Sharma and her husband had been in the apartment between the time her purse was last seen and when Dr. Sharma learned it was missing; (4) on May 30, 2013, someone used Dr. Sharma's stolen credit cards to make unauthorized purchases at the Duane Reade, Popeye's, and Macy's; (6) the Macy's Video showed a man and a woman making unauthorized purchases using one of Dr. Sharma's credit cards; (7) Dr. Sharma had identified the man in the Macy's Video as Plaintiff; and (8) Plaintiff resembled the man on the Macy's Video. The Court finds that the totality of the circumstances, including these facts, established probable cause to arrest Plaintiff for the theft of Dr. Sharma's property on May 29, 2013. *See Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002) ("A district court must look to the 'totality of the circumstances' in deciding whether probable cause exists to effect an arrest." (citing *Gates*, 462 U.S. at 233)); *Stansbury v. Wertman*, 721 F.3d 84, 91–92 (2d Cir. 2013) (circumstantial evidence that a person may have had the opportunity to commit the crime is probative as to the likelihood of her being the perpetrator).

Plaintiff argues that Detective Kelly did not have probable cause because Dr. Sharma failed to identify Plaintiff as the perpetrator when she first viewed the Macy's Video and the photograph of the man and woman at Macy's, and because Dr. Sharma did not see Plaintiff or any of his co-workers with her bag or her credit card. (Pl. Br., Dkt. No. 37-1 at ECF 3–4.) Plaintiff argues that these facts undermined Dr. Sharma's credibility. (Pl. Br., Dkt. No. 37-1 at ECF 4.) Plaintiff also argues that probable cause was undermined when Detective Kelly did not investigate further after Dr. Sharma initially failed to identify anyone from the Macy's Video. (Pl. Br., Dkt. No. 37-1 at ECF 3.) He argues that Detective Kelly should have sought the photographs of the other maintenance workers or questioned the other maintenance workers. (Pl. Br., Dkt. No. 37-1 at ECF 4–5.)

Plaintiff's arguments are unavailing. First, "[w]hen information is received from a putative victim or an eyewitness, probable cause exists . . . unless the circumstances raise doubt as to the person's veracity." *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (citing *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995)). Nothing in the record shows that Detective Kelly had a reason to doubt Dr. Sharma's veracity. That Dr. Sharma did not identify Plaintiff when she first viewed the Macy's Video and the photographs is insufficient on its own to undermine her veracity. *See, e.g.*, *Green v. City of N.Y.*, No. 06-CV-3942, 2008 WL 4394679, at *1 (E.D.N.Y. Sept. 23, 2008) ("The eyewitness identifications, combined with evidence of motive, provided probable cause for the arrest of plaintiff, notwithstanding the fact that one of the witnesses who also identified him, had previously identified someone else from a single photograph which she was shown . . . ."). Further, "New York courts routinely hold that a victim's photo identification of a person provides the police with probable cause to arrest that person, even where the identification may not be 100% reliable." *Norwood v. Mason*, 524 F. App'x 762, 765 (2d Cir. 2013) (summary order); *Keith v. City of N.Y.*, 641 F. App'x 63, 66 (2d Cir. 2016) (summary order) ("What is more, we are unaware of any pertinent case in which a court has suggested that, in order for a witness's identification of a perpetrator to provide probable cause, it must be made with complete certainty. Indeed, courts have explicitly held that it need not be."). Also, there is evidence in the record that Dr. Sharma saw Plaintiff at Lefrak City at least two times between her first and second viewing of the Macy's Video; indeed, it was Dr. Sharma who called Detective Kelly to report that she now knew the name of the man in the Macy's Video. (Pl. 56.1 ¶¶ 50–53.) Further, there is no evidence in the record showing that Dr. Sharma had any incentive to single out or falsely accuse Plaintiff as the perpetrator; Dr. Sharma was not even liable for the unauthorized charges. (Pl. 56.1 ¶ 29.) Thus, the Court finds that there was no evidence in the record that would

cause Detective Kelly to question Dr. Sharma's veracity.[8]

Plaintiff's next argument, that Detective Kelly did not act reasonably when he failed to investigate further, also fails. "Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti*, 124 F.3d at 128 (citing *Baker*, 443 U.S. at 145–46 (arresting officers not required to investigate claim of mistaken identity or lack of requisite intent) and *Krause v. Bennett*, 887 F.2d 362, 372 (2d Cir. 1989) (factfinder, not arresting officer, determines whether defendant's story holds up)); *Curley*, 268 F.3d at 70 ("[T]he arresting officer does not have to prove plaintiff's version wrong before arresting him."). Thus, Detective Kelly had no duty to investigate further after Dr. Sharma identified Plaintiff as the man in the Macy's Video and Detective Kelly believed that probable cause existed to arrest Plaintiff.

Accordingly, the Court finds that there are no material issues of fact and that no reasonable juror could find that Detective Kelly lacked probable cause to arrest Plaintiff. *See Stansbury*, 721 F.3d 92, 94 (2d Cir. 2013) (holding that no reasonable juror could have held that the arresting officer did not have probable cause "[b]ecause there was an identifiable crime and a substantial volume of contemporaneously-recorded, uncontroverted circumstantial evidence that supported the conclusion that [plaintiff] was the perpetrator"). Because probable cause existed at the time of Plaintiff's arrest,[9] Plaintiff's federal and state law false arrest claims fail as to Detective Kelly and

---

[8] Though not necessary to the Court's ruling, it should be noted that even doubts about a victim's veracity do not completely dissipate probable cause. *See Curley*, 268 F.3d at 70 (probable cause not undermined where the officer received different stories from the alleged victim and the arrestee, and where the investigation might have cast doubt on the basis of arrest).

[9] Because the Court finds that there was probable cause to arrest Plaintiff, it need not reach the question of qualified immunity, as "arguable probable cause" is a lower standard. *See Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (Defendants "will still be entitled to qualified immunity from a suit for damages if he can establish that there was arguable probable cause to arrest" the plaintiff. "Arguable probable cause exists if either (a) it was objectively reasonable for the officer

the City. *See Jenkins*, 478 F.3d at 84 ("The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest,' whether that action is brought under state law or under § 1983." (quoting *Weyant*, 101 F.3d at 852)).

## **CONCLUSION**

For the reasons set forth above, the Court grants summary judgment to Defendants on Plaintiff's federal and state law false arrest claims. The Clerk of Court is respectfully directed to enter judgment for Defendants and terminate this action.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 27, 2017
       Brooklyn, New York

---

to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." (quotation marks and citations omitted)). However, the Court does note that even if Dr. Sharma's identification was faulty and excluded from the probable cause determination, Defendants would still be entitled to summary judgment because the other evidence in the record, including Detective Kelly's independent assessment that Plaintiff resembled the man depicted in the Macy's Video, would support "arguable probable cause."